In re **THE GREATER SOUTHEAST COMMUNITY HOSPITAL FOUNDATION, INC.,** et al. (members of The Greater Southeast Healthcare System), Debtors.

No. 99–1159.

United States Bankruptcy Court, District of Columbia.

July 9, 2001.

David B. Tatge, Epstein Becker & Green, P.C., Washington, D.C.

David Heubeck, Venable, Baetjer and Howard, Baltimore, MD.

David Folds, Jeffrey L. Tarkenton, Womble Carlyle Sandridge & Rice, PLLC, Washington, D.C.

Barbara Ward, Washington, D.C.

Sam J. Alberts, Akin, Gump, Strauss, Hauer & Feld, Washington, D.C.

## DECISION RE DEBTORS' OBJECTION TO CLAIMS OF THE PLAN ADMINISTRATION COMMITTEE FOR THE GREATER SOUTHEAST HEALTHCARE DEFINED CONTRIBUTION PLAN AND THE DISTRICT OF COLUMBIA NURSES ASSOCIATION

S. MARTIN TEEL, Jr., Bankruptcy Judge.

The debtors in these jointly administered cases are participating employers in the Greater Southeast Healthcare System Defined Contribution Pension Plan ("the Pension Plan" or "the Plan"). The court addresses the objection of three of the debtors to the administrative claims filed by the Pension Plan, through its Plan Administration Committee ("the Plan Committee") and the District of Columbia Nurses Association ("DCNA").[1] The three claims at issue arise out of the Pension Plan: (1) a claim against the debtors for contribution to the Pension Plan for the year 1999; (2) a claim against the debtors for contribution to the Pension Plan for the year 1998; and (3) a claim against the debtors for the costs and expenses of the Plan Committee. The court concludes with respect to the principal issues that: the contribution claim for 1999 is, first, owed (because the employees were still employees on December 31, 1999), and, second, entitled to administrative expense treatment (because the event trig-

---

1. Pursuant to Fed.R.Bankr.P. 7052, this decision constitutes the court's findings of fact and conclusions of law.

gering liability was a postpetition event—employment on December 31, 1999);[2]

the undisputed liability for the contribution claim for 1998, to the extent the final triggering event of liability occurred on or after November 28, 1998, is in its entirety entitled to priority under and subject to the dollar limitations of 11 U.S.C. § 507(a)(4), but is not entitled to treatment as an administrative claim (despite provisions in a postpetition collective bargaining agreement calling for benefits to remain unchanged);[3] and

the postpetition expenses of the Plan Committee are entitled to administrative expense treatment for the period ending May 1, 2000, but not thereafter (because of a May 1, 2000, amendment of the Pension Plan).

The debtors filing the objection—Greater Southeast Community Hospital Foundation, Inc. ("the Foundation"); Greater Southeast Community Hospital Corporation ("GSCHC"); and Greater Southeast Management Company ("the Management Company")—will be referred to as "the debtors." Together with the remaining debtor, the Fort Washington Nursing Home, Inc., and certain non-debtor entities, they are part of the Greater Southeast Healthcare System. The claims are principally the result of the employment by GSCHC of numerous employees as an operating hospital, and as a practical matter the Foundation and the Management Company play a minor role in the disputes. The Foundation is the parent company of all of the other entities in the System. The Management Company provides management services to the other entities (such as processing payroll for them).

## I

## ADMINISTRATIVE CLAIM FOR 1999 PLAN CONTRIBUTION

The dispute to which the court first turns is the debtors' contention that they are not obligated to make any contribution to the Plan for the year 1999 because the employees failed to satisfy a condition necessary to the receipt of the contribution, namely, that they be employed on the last day of the calendar year. The debtors maintain that the employees were no longer employees of the debtors as of December 31, 1999 because the debtors consummated an asset purchase agreement on December 30, 1999, at which time the employees' employment was terminated.

### A.

### FACTS

#### 1.

*Relevant Provisions in the Pension Plan*

Pursuant to Article 4.2 of the Plan[4] the debtors are required to make an annual

---

2. Employees who became entitled to a Plan contribution even though they were not employed at year-end are a minor separate issue.

3. For example, § 507(a)(4) priority (subject to its dollar limitations) applies to the contribution owed for employees for whom liability was finally triggered by being employed on December 31, 1998. Section 507(a)(4)(B)(i) imposes a maximum of $4,000 per employee covered by the plan, and § 507(a)(4)(B)(ii) imposes a reduction for amounts paid under 11 U.S.C. § 507(a)(3).

4. Article 4.2 provides:

Subject to Article 5 hereof, the Employer will contribute to the Plan as of the end of the Plan Year an amount equal to three percent (3%) of the Compensation during the Plan Year (five percent (5%) for any Plan Year ending prior to January 1, 1998) of each Participant while a Participant, provided that no contributions will be made on behalf of any Participant for a Plan year unless (i) he is credited with a Year of Service during such Plan Year and he is employed by the employer on the last day of

contribution of 3% of each eligible employees' compensation, provided that the employee is employed on the last day of the calendar year and is credited with one year of service.[5] The annual 3% contribution is also required if a participant dies, retires after age 65 or becomes disabled during the Plan Year regardless of the amount of hours worked, but the debtors have not objected to the administrative claim for the 1999 Plan contribution claim to the extent it is based on such eligibility.[6]

## 2.

### *The Debtors' Financial Decline and Bankruptcy*

Dr. George Gilbert was the CEO of the debtors from July 1998 to December 30, 1999. According to Dr. Gilbert, GSCHC ran a profit in 1995 and 1996. However, in 1997 there was an abrupt change in GSCHC's financial standing which found GSCHC burdened with several million dollars in losses by the end of that year. In 1998 GSCHC also suffered losses approaching 40 million dollars.[7] Soon after taking over as CEO, Dr. Gilbert retained

Rutherford & Cohen as financial advisors in order to obtain a cash flow projection and to identify where productivity cuts could be made. Rutherford & Cohen concluded that expenses were exceeding revenues by 3 million dollars per month and that GSCHC would not be able to meet its December 1998 payroll.[8] As a result of these findings, Dr. Gilbert initiated a series of cost saving measures, such as reductions in personnel and closing physician practices and unprofitable units. These cuts alone were insufficient and other areas for savings were also identified such as an across-the-board pay cut and termination of the funding of the sick leave payout and the Pension Plan. By the spring of 1999, although GSCHC had made significant inroads into alleviating expenses, it was still losing 1.82 million dollars per month. Accordingly, GSCHC began to solicit an alliance partner although that effort generated only one response from Doctors Community Hospital ("Doctors").[9]

A second evaluation of the GSCHC's financial health was completed by Arthur Anderson at the behest of the bondholders.

the Plan Year or (ii) he retires at or after his Normal Retirement Date, died or incurred (and satisfied all of the requirements for) a Disability during the Plan Year.

5. A "Year of Service" is defined as a Plan Year during which a plan participant completes at least 1,000 hours of service. Under Article 1.34 of the Plan, a Plan Year is defined as the calendar year.

6. The court assumes that the debtors have either viewed the amounts arising from pre-petition retirement, death, or incurring of a disability as too insignificant to warrant an objection (particularly in light of the priority such 1999 Plan contribution claims would alternatively enjoy under 11 U.S.C. § 507(a)(4)—a provision discussed later with respect to the 1998 Plan contribution) or that the parties have agreed among themselves to litigate the principal issue first, with this minor issue to be resolved by agreement or litigation later.

7. Dr. Gilbert stated that the losses were due in part to three significant factors: (1) the District of Columbia changed the formula by which it reimbursed GSCHC for "disproportionate share payments" and that change was retroactively applied in 1997 and 1998 resulting in a loss of $7 million from GSCHC's Medicaid budget; (2) the passage of the Federal Balanced Budget Act in 1997 resulted in a cut of $3–4 million from the GSCHC's Medicare budget; (3) the user rate of the emergency room at the hospital dropped 13–15% resulting in a marked decrease in occupancy.

8. GSCHC ultimately met its December 1998 payroll by obtaining an advance payment of the disproportionate share payments from the District of Columbia.

9. Doctors eventually acquired a large part of the assets of GSCHC through an asset purchase agreement.

Arthur Anderson indicated that it would be unlikely that the hospital could survive and that it should be liquidated. Notwithstanding that forecast, GSCHC developed a turnaround plan that required a capital infusion of 22 million dollars. The turnaround plan included a 5% across-the-board pay cut and elimination of the Pension Plan benefit. In conjunction with the turnaround plan, the board approved a resolution in March 1999 to terminate the Pension Plan benefit, but ultimately, Dr. Gilbert elected never to give notice to implement the termination lest it harm employee morale. Meanwhile, the District of Columbia rejected GSCHC's turnaround plan in May 1999. At that point, GSCHC had completely run out of funds, prompting Dr. Gilbert to inform the District of Columbia that the hospital would close. The District agreed to offer financial assistance provided that GSCHC file for bankruptcy protection and retain a turnaround firm to manage the hospital. GSCHC and the other debtors filed their chapter 11 petitions on May 27, 1999. As agreed, the District of Columbia provided 8 million dollars in financing and the Intense Resource Group (IRG) was hired as the turnaround consultant.

In October 1999, IRG completed its assessment and turnaround plan which was projected to cost 12 million dollars to implement. GSCHC was unable to raise the necessary capital to implement the plan and therefore the only remaining option was to sell or close the hospital.

3.

*Approval of the Asset Purchase Agreement and the CBA*

On November 16, 1999 the court approved the Asset Purchase Agreement be-

tween Doctors and GSCHC. Pursuant to that agreement, closing was to occur on the earlier of December 31, 1999, or the date all closing conditions were met. GSCHC had financing to cover its operating expenses through December 31, 1999, thus, it was imperative that the sale close no later than December 31, 1999. In the event that the transaction was not ultimately consummated, GSCHC set aside cash reserves to implement a shut-down plan.

On August 3, 1999, GSCHC entered into a collective bargaining agreement ("CBA") with DCNA which was approved by the court on September 15, 1999. Article VI of the CBA[10] provides that the hospital must provide DCNA with fourteen days' notice of any layoff or reduction in force.

After approval of the Asset Purchase Agreement with Doctors, Herman Brown, counsel for DCNA, received a letter dated December 20, 1999, from Allen Siegel, counsel for Doctors. In that letter, Siegel informed Brown that Doctors contemplated commencing operations at GSCHC "at some point during the month of January" and that all members of the collective bargaining unit "will be considered for employment by DCHC on a non-discriminatory basis along with any other applicants for employment that may seek employment with DCHC." Siegel also informed Brown that Doctors would not assume or agree to be bound by the CBA, but intended to enter into negotiations for a new agreement with DCNA.

Subsequent to that correspondence, Doctors and DCNA entered into negotia-

10. Article VI, paragraph 3 provides:
The hospital will provide the Association with fourteen (14) days notice of layoffs, reductions-in-force or the elimination of bargaining unit positions. At the time of this notice, the Hospital will also provide to the Association current seniority lists in the units/departments affected and the number and location of any registered nurse vacancies.

tions and reached an agreement ("the DCNA–Doctors Agreement") outlining the terms and conditions pursuant to which the nurses would agree to work for Doctors. That agreement specified that it would be effective January 1, 2000.[11]

### 4.

### *The Closing and Post–Closing Activity*

Throughout the period of financial uncertainty, Dr. Gilbert attempted to keep employees informed by holding employee forums. During at least one of these meetings in the spring of 1999, Dr. Gilbert advised the employees that the hospital's board of directors had adopted a resolution authorizing the termination of the Plan. Gilbert did not tell the employees that the Plan was discontinued, rather, they were told that termination of the plan (along with other proposed cuts) was something "on the table" and that it was part of a larger turnaround plan. He also indicated that he would keep the employees informed as to when or whether the "trig-

ger" would be pulled. However, the resolution was never implemented.[12]

After the approval of the sale, Dr. Gilbert held additional employee forums. He told the employees that he thought they would become employees of the purchaser and, although he could not guarantee their employment, he felt that significant reductions in staff were not probable because there had already been considerable layoffs.[13] Dr. Gilbert described the sales transaction as a "rollover," meaning that the control of the hospital was going to roll over from the current board of directors to Doctors. Once the rollover occurred, Gilbert would no longer be responsible for the management of the hospital and the employees would be "transferred" and subject to whatever fate awaited them at Doctors. Dr. Gilbert never had any specific discussions with the employees regarding when they would be terminated as employees of GSCHC given that he had no way of knowing who would be hired by Doctors (which did not have any contractual obligation to employ the debtors' employees). Dr. Gilbert never told

11. The agreement further specified in paragraph five that the "[n]urses will carry over their seniority with GSE to their new employment with DCHC **when employed in January 2000.**" (Emphasis added.)

12. During the fall of 1999, Dr. Gilbert recalled that the debtors' creditors wanted the debtors to terminate the Pension Plan. However, Gilbert felt that termination of the Plan had become a "nonissue" because he understood that the Plan would terminate if the sale transaction with Doctors closed by the end of the year. Thus, he saw no reason to go through the agony of notifying the employees that the Plan was terminated given that the Plan would terminate on its own. Although Dr. Gilbert does not recall attending a meeting with the debtors' counsel regarding whether to implement the resolution, Robert Shelton, counsel for the debtors, indicated that on December 9, 1999, a meeting took place to discuss whether or not to implement

the resolution. David Rice, counsel for the debtors, Virgil McDonald, chairman of the board, Kenneth Hoffman, counsel for the debtors, and Robert Shelton attended the meeting. During that meeting a discussion ensued regarding whether notice of termination of the Plan should be given to the employees. The parties discussed the alternative of not sending the notice because there would be no obligation to fund the plan if the transaction closed on or before December 30, 1999. Shelton indicated that he felt that they could comfortably close the transaction prior to December 30, 1999. Given that assurance, Gilbert and McDonald concurred that it would be a waste of time, money and focus to implement the resolution.

13. As late as December 30, 1999, the date of the scheduled closing of the asset purchase, Dr. Gilbert did not know which employees would be employed by Doctors and which would be retained by the debtors.

the employees that their employment would terminate the moment that the hospital was sold.

The closing of the sale was initially scheduled for December 23, 1999. The parties were unable to close due in part to the delay in negotiating a settlement regarding Medicare payments. On December 29, 1999, the Medicare issue was resolved and the parties scheduled the closing for December 30, 1999.

On December 30, 1999, Dr. Gilbert went to the offices of Epstein, Becker, & Green ("Epstein & Becker"), counsel for Doctors, where he executed numerous closing documents including a deed and settlement statement. Robert Shelton stated that he arrived that morning and that by noon all the documents were executed. Shelton indicated that at some point in the afternoon, it became apparent that no funds would be wired to complete the transaction. Shelton informed David Tatge, counsel for Doctors, that GSCHC had authority to operate the hospital only until December 31 and, as a practical matter, the hospital had run out of funds. He told Tatge that a further consequence of failing to close the transaction on December 30 would be that GSCHC would be obligated to fund its Pension Plan, resulting in a liability of over one million dollars. According to Shelton, this was the first time he mentioned the Pension Plan liability to Doctors and he decided to do so in order to put more pressure on Doctors to close, or in Shelton's words "I was playing every card that I had, sometimes even more than once." Subsequent to that discussion, Paul Tuft, Chairman and CEO of Doctors, presented Shelton with an 18.5 million dollar check drawn on Doctors' Hadley Hospi-

tal. Shelton indicated he thought the debtors could "work" with that but Doctors would need to obtain an irrevocable and unconditional commitment to fund the check from its lender. Shelton proceeded to draft an irrevocable commitment, and it was forwarded to National Century Financial Enterprises, Inc., the financier of the transaction. There was continual discussion throughout the evening, and at approximately 11:00 p.m., Shelton asked to be included in the conference calls taking place with National Century. He spoke with Peggy Scott, counsel for National Century, and told her that the debtors had run out of funds and had no further spending authority past December 31. He also informed her about the potential Pension Plan liability should there be a failure to close on December 30.

At 11:55 p.m., Shelton and the other attorneys engaged in a telephone conference with Scott and Randolph Speer of National Century, regarding the wording of the irrevocable commitment. At the end of that conversation Speer indicated that he wanted to confer privately with Scott. Several minutes later, at 11:58 p.m.,[14] Scott called and stated that National Century had agreed to the irrevocable commitment and would forward it by fax. Shelton stated that once Scott orally confirmed National Century's agreement, Tatge turned to him, extended his hand and said "Congratulations we're closed." The facsimile containing National Century's executed irrevocable commitment was received at the offices of Epstein & Becker after December 30, 1999, sometime during the first few minutes of December 31, 1999.[15]

___

14. Shelton noticed the time because Tatge had a clock on his telephone and he looked at it when he was shaking hands with Tatge.

15. Shelton stated that Tatge brought it to him within 2, 3, or 4 minutes after their telephone conversation with Scott, but he did not have a watch on to be sure of the time. The fax itself

Ana Raley, the incoming CEO of the hospital on behalf of Doctors,[16] received a telephone call from Tuft at 12:15 a.m. on the morning of December 31, 1999. According to Raley, Tuft informed her that "the hospital is yours." Raley then made several telephone calls and arrived at the hospital around 1:00 a.m. Upon arrival, she asked to be taken from floor to floor. She visited every unit (which took 2–3 hours) meeting the employees and informing them that Doctors was the new owner of the hospital and that they were now employees of Doctors. Raley left the hospital and returned around 10:00 a.m. that morning. She again walked the entire hospital meeting with employees and telling them that they were now employees of Doctors. Raley again left the hospital and returned at 9:00 p.m. later that evening. During an employee gathering in the cafeteria, Raley told approximately 200 to 300 employees about the acquisition.[17]

As of December 30, 1999, GSCHC and the other debtors had not taken any affirmative steps to terminate their employees. GSCHC gave no notice or other communication to employees that their employment would be deemed terminated upon sale of the hospital.[18] GSCHC took no steps to terminate the employees after the closing of the sale.[19]

## B.

### LIABILITY FOR THE 1999 CONTRIBUTION

The court first addresses whether the debtors are liable to make the 1999 contribution. The court finds that the debtors are liable to make the 1999 contribution because, as of December 31, 1999, the debtors' employees were still employed by the debtors. The court so concludes because there was no evidence that the debtors terminated the employees' employment before or at the time of the purported closing[20] at 11:58 p.m. on December 30, 1999.

has a time notation of 1:04 a.m. and a date notation of December 31, 1999. Shelton stated that the time notation on the fax was incorrect.

16. The hospital was actually acquired by Greater Southeast Community Hospital–I, a subsidiary of Doctors, but for ease of reference the new business owner will be referred to as Doctors.

17. The hospital had approximately 1,000 employees at that time.

18. Dr. Gilbert testified that he was unaware of any notice or other communication given to employees regarding termination of their employment upon sale of the hospital. The court inquired whether he had any specific discussions with the employees as to when they would be terminated as employees of the hospital. Dr. Gilbert replied that he had not had specific discussions because he did not know when the employees would move over to Doctors. He also acknowledged that the employees would become employees only if Doctors agreed to hire them.

19. Gilbert was not aware of any communication to the employees or anyone else that the employees were no longer employed. *See* Gilbert Dep., p. 18. Gilbert also was not aware of any notice, oral or written, given to management or personnel after the closing that their employment was being terminated. Gilbert Dep., p. 21.

20. For purposes of the above discussion, it is unnecessary to determine whether, as a matter of law, the sales transaction closed at 11:58 p.m. on December 30, 1999 or at some other point in time, but there are obvious issues in this regard. These uncertainties, although not resolved by this court, nevertheless highlight why it was important for the debtors clearly to communicate to the employees that their employment was ended: the termination ought not rest on a purported closing, of questionable effectiveness, that was never communicated to the various employees until well into December 31, 1999, or later.

For example, Tatge's and Shelton's shaking hands just before midnight to signify that the

### 1.

In examining all of the evidence, the debtors never told their employees that, upon the sale being completed, their employment by the debtors would be terminated. Instead, they told the employees that the hospital would be sold and that it was anticipated or hoped that most of the employees would be "rolled over" into the employment of the purchaser. Dr. Gilbert unequivocally testified that he did not provide any notice, oral or written, of termination to the employees either before or after the sale.

Notwithstanding the lack of notice of termination of employment, the debtors maintain that "[s]everal minutes prior to 12:00 a.m. on December 31, 1999, all but two employees of GSCHC and most employees of GSMC ceased their employment with these entities and became employees of Doctors."[21] The debtors suggest that a termination of employment occurred simply because Doctors became responsible for the operation of the hospital when the Asset Purchase Agreement closed. Yet, they ignore the distinction between Doctors' responsibility for the physical operation of the hospital versus its employment of its own staff to carry out the functions of the hospital. For example, Doctors could be responsible for hospital operations yet staff its units with temporary personnel. That Doctors now had ownership of and responsibility for the hospital,

namely, its equipment and assets, does not establish that the debtors' employees somehow automatically became the employees of Doctors. The mechanics of a "rollover" were never explained: no one ever informed the employees that their employment would cease upon completion of the sale; nor did Doctors commit that the employees would become employees of Doctors upon the sale being completed. Indeed, the debtors continued to employ several employees after the sale who had not been advised that they would continue to remain employed by the debtors after a sale.

Obviously, between the completion of the sale and Doctors hiring any employees as its own employees, there had to be employees operating the hospital. Similarly, when the sale was completed there had to be employees already on site operating the hospital. The employees could only guess as to whose employees they would be during that period before they were hired by Doctors or as of the moment of the sale being completed and before word could be sent that the sale was completed. They could assume that since they were not being automatically terminated by the debtors that they would continue as such until they were hired by Doctors, with the debtors and Doctors to settle between themselves who would be respon-

deal was closed was arguably conditioned on receipt of the forthcoming fax from Doctors' lender confirming its irrevocable commitment. That fax was received a short while later but, critically, on December 31, 1999, and with material changes in the faxed commitment previously wired to the lender. (The fax was received before Tuft of Doctors told Raley that the hospital was now hers to run, thus suggesting that the parties waited until after the fax's receipt to treat the deal as really closed.) Had the fax never arrived, one must question whether the debtors, through

Shelton, intended to treat the deal as really closed. (There are additional facts and arguments, not discussed in this decision, that the claimants contend require a conclusion that the closing did not occur until after December 30, 1999.)

21. "Supplemental Memorandum in Support of Debtors' Objections to the Proof of Administrative Claim Filed by Greater Southeast Healthcare System Defined Contribution Plan and Others" ("Supplemental Memorandum"), pp. 16–17.

sible for the cost of their employment.[22] In other words, they could work as employees of the debtors, albeit taking direction from Doctors, and then Doctors would reimburse the debtors for Doctors' temporary use of its employees.

Moreover, Doctors did not wish to make any definitive commitment to hire any particular employee upon closing the asset purchase transaction. Dr. Gilbert emphasized to the employees that he could not guarantee that they would be employed by Doctors. In addition, once the transaction was consummated, the debtors' employees were informed that they had to reapply for their positions.[23] Employees were placed on a 90–day probation period during which time a performance assessment would take place and the ultimate decision whether to hire would be made.

### 2.

A fundamental principle inherent in contract law is freedom of contract—the freedom to determine whether or not to enter into a contractual relationship. The debtors argue that by virtue of the closing, their employees became the employees of Doctors, much the same way that the hospital's physical assets became the assets of Doctors. Yet, the employees are not physical possessions whose ownership could be transferred upon completion of a sale; rather, each employee had a right to determine whether or not to become an employee of Doctors if given the opportunity.

This point is illustrated by several cases. In *Murray v. Union Ry. Co. of New York City*, 229 N.Y. 110, 127 N.E. 907 (1920), the plaintiff's employer (Washington Detective Services) sent him to assist in protecting passengers riding the railways during a strike. He was injured in a collision and sued the railway company. The railway company argued that it could not be sued for negligence because the plaintiff was its employee and therefore limited to his worker's compensation remedy. The court disagreed finding "nothing in these facts which was equivalent as a matter of law to the acceptance of a change of masters." *Id.* The court further stated that an employee could not be employed by a new employer without the employee's knowledge and consent:

> [E]mployment, like any other contract, presupposes understanding. The new relation cannot be thrust upon the servant without knowledge or consent. . . . He must understand that he is submitting himself to the control of a new master. . . . Common-law rights and remedies are not lost by stumbling unawares into a new contractual relation. There can be no unwitting transfer from one service to another.

*Id.* (citations omitted).[24] The debtors' employees were entitled to notice that their

---

**22.** Illustratively, Ed Heely, a former employee of the debtors, stated that as of December 31, 1999, he continued to look to the debtors for direction as an employee. He was never told that as of the time of the closing that he would become an employee of Doctors. Jane Hersee–Lee another former employee of the debtors also was never notified in 1999 that her employment with the debtors had terminated. She learned that she no longer worked for the debtors when she met with Ana Raley on January 3, 2000.

**23.** Illustratively, Cynthia Mann, a former employee of the debtors, learned on January 3,

2000 that she would be given an opportunity to be employed by Doctors and was directed to fill out a job application.

**24.** Likewise, in the case of *Globe & Rutgers Fire Ins. Co. of New York v. Jones*, 129 Mich. 664, 89 N.W. 580 (1902), the defendant Jones was employed by the Rutgers Fire Insurance Company under a five-year contract. Rutgers then merged with the Globe Fire Insurance Company. After the merger the defendant refused to turn over certain funds he had collected and the newly-formed insurance company sued for their recovery. The court determined that the merger constituted a

employment was terminated and entitled to decide whether to accept or decline employment with Doctors.[25]

While the court rejects the suggestion that the employees could somehow become automatically employed by Doctors without their knowledge and consent, the issue of whether the employees were employed by Doctors does not fully address the issue of whether the debtors terminated the employment of the employees. As a general rule, a contract is terminated when clear and unambiguous notice of its termination is given. *Shaw v. Beall*, 70 Ariz. 4, 215 P.2d 233, 234–35 (1950) (notice of termination must be clear, conveying an unquestionable purpose to insist upon a termination); *Stovall v. Publishers Paper Co.*, 284 Or. .53, 584 P.2d 1375, 1377 (1978) (notice must be clear and unambiguous, conveying an unquestionable purpose to insist on the rescission).[26] With respect to at-will employment[27], the employer may be excused from providing **advance** notice of termination; however, to terminate the employment contract, the employer must nonetheless provide notice to the employee that the employment contract is terminated.

In this case, there was no clear and unambiguous notice to the employees that their employment with the debtors was terminated. The debtors, in asserting that a termination of employment was effected, support their position by citing numerous cases[28] concerning the obligation of a for-

---

breach of Rutger's employment contract with Jones and rejected the insurance company's argument that the employment contract had simply passed to the new corporation by virtue of the merger. The court noted that in contracting to work for another, "the parties are treated as having contracted in reference to the personal qualities of each other...." Thus, the employee "has a right to say for whom he will work, and under a contract to work for one company he cannot be required to work for an entirely different company." *Id.* at 581.

25. The earliest moment that any employee arguably could be deemed to have become an employee of Doctors is when Ms. Raley came to the hospital on December 31, 1999, and announced that the sale was complete and that the employees were now employees of Doctors. From a contractual perspective, arguably an employee so advised by Ms. Raley would now understand that if he continued to work at the hospital, he had implicitly accepted the new entity's offer of employment. Whether accepting that employment would effect a termination of his employment with the debtors is a distinct issue academic to the question of the debtors' liability for a 1999 pension contribution: the new employment would have come after the employee had already been employed by the debtors for part of December 31, 1999.

26. This rule makes sense given that a party to a contract without notice of its termination would, in all likelihood, continue to perform. In *Stovall*, the court, citing to 3 Black, On Rescission and Cancellation (2d ed.1929), stated:

> As a general rule, one who desires to exercise his right to terminate or rescind a contract must first give the opposing party notice that he is doing so.
> Further, a notice of the rescission or termination of a contract, to be effective as such, "must be clear and unambiguous, conveying an unquestionable purpose to insist on the rescission." Black further states (at 1413–1414):
> > "***And where the conduct of one having the right to rescind a contract is ambiguous, and it is not clear whether he has rescinded it or not, he will be deemed not to have done so."
> In addition, according to Black (at 1414), a notice of rescission must be not only unequivocal but unconditional.

*Stovall*, 584 P.2d at 1377–78 (citations omitted).

27. With the exception of the nurses, the parties did not provide details regarding the employment contracts at issue. It is likely that many employees of the debtors were employed on an at-will basis.

28. *Dahl v. Brunswick*, 277 Md. 471, 356 A.2d 221, 225 (1976) (and also two cases cited by *Dahl* ); *Anderson v. Ciba–Geigy Corp.*, 759

mer employer to pay severance pay to its discharged employees. However, these cases are not relevant to this case because the **moment** of termination was not at issue in those cases.[29] The cases concerned whether the sale of the employer's business, which caused a cessation of the employer-employee contract, constituted a termination of employment so as to trigger the obligation to pay severance pay to the employees even though the employees continued to be employed by the new owner.[30]

*Carouso v. Empire Case Goods Co.*, 271 A.D. 149, 63 N.Y.S.2d 35 (1946), is on point. In *Carouso*, the court determined that Empire, the seller/employer, was liable to its employees for vacation pay even though the employer had sold its business during the pay period in question. The employees were aware that some change in ownership might occur, but when the transaction closed, Empire did not give notice to its employees of the sale. The court determined that Empire was liable for the vacation pay wages that accrued after the sale had closed because the employees had no knowledge of the sale. The court relied on the following rule in its decision:

> And where the master disposes of his business to another without notifying the servant of the change, and the latter continues his services thereafter, the master is liable for the servant's wages so long as he remains without notice, but in case of contracts terminable at will, actual knowledge by the servant of the change of employers, however acquired, will release the employer.

*Carouso*, 271 A.D. 149, 63 N.Y.S.2d 35 at 39 (citation omitted).[31] Significantly, the

---

F.2d 1518 (11th Cir.1985); *Blau v. Del Monte Corp.*, 748 F.2d 1348, 1351 (9th Cir.1984); and *In re Old Electralloy Corp.*, 167 B.R. 786 (Bankr.W.D.Pa.1994).

**29.** In addition to the severance pay cases, the debtors cite *Groshoff v. St. Gertrude's Convent*, 44 Idaho 554, 258 P. 528 (1927) (involving the plainly irrelevant question of liability of a successor owner to the original employer's employee), and *Phillips v. Amoco Oil Co.*, 614 F.Supp. 694 (N.D.Ala.1985), *aff'd*, 799 F.2d 1464 (11th Cir.1986). In *Phillips*, 614 F.Supp. at 704 n. 12, the issue was not when Amoco terminated the employees' employment, but when the employees learned that Amoco had falsely represented that it intended to employ the employees for lifetime. They learned by way of notice on August 21 that their employment would terminate upon the closing of the sale which occurred on September 4. The employees conceded that "when the sale was officially closed ... they ceased to be employed." *Phillips*, 614 F.Supp. at 704.

**30.** In addition, although the timing of termination was not an issue in these cases, in at least one of these cases the facts reveal that there was advance notice. In *Dahl*, 356 A.2d at 221, the employees were told that they could not remain with their employer and,

effective a date certain, they would be employed by the purchaser. In only one case (*Anderson*, 759 F.2d at 1520), the employees did not learn of the change of ownership until they arrived at work one day, but this was mentioned to show that the employees suffered no unemployment, with no one disputing that the prior owner's employment of the employees ceased on the change in ownership. Even if learning of a new owner suffices to trigger a termination of employment, that does not help the debtors here because the debtors' employees only learned of the change in ownership after the magical moment of 12:00 a.m. on December 31, 1999, had passed.

**31.** This rule makes sense when viewed from a contractual perspective and in light of the legal concepts discussed above. When the employee is informed of the completion of the sales transaction, the employee has in effect received notice of termination of his employment given that the former employer cannot continue to perform under the employment contract. If the employee continues to work notwithstanding his knowledge of the closing, the employee has in essence "accepted" an offer of employment from the new employer.

court noted that knowledge of the negotiations was not equivalent to knowledge of the sale. *Carouso*, 63 N.Y.S.2d at 39. This case is similar: the debtors' employees were aware of the strong possibility that the hospital would be sold, but were equally aware that there was a possibility that the hospital might be shut down at the end of December 31. Not one employee was told that her employment would be terminated as of a date certain and not one employee had actual knowledge of the purported closing of the sale at 11:58 p.m. on December 30. The earliest that any employee was made aware of the sale was well after December 30 had come to an end. Thus, at 12:01 a.m. on December 31, 1999, the debtors' employees continued to be employed by the debtors thereby satisfying the Plan's requirement that they be employed by the debtors on the last day of the year.

There are several additional considerations with respect to the nurses that lend further support to the court's decision. As noted above, the CBA required that GSCHC provide a 14–day notice of any layoff thereby foreclosing any immediate termination of any nurse. In addition, the DCNA–Doctors agreement which contained the terms of employment with Doctors was not effective until January 1, 2000, and made a specific reference to the nurses' new employment in January 2000.

■ The debtors attempt to escape their Pension Plan contribution obligation for 1999 by raising what amounts to a waiver argument. With the exception of the few employees that the debtors continued to employ after 1999, Doctors' paid the employees' wages for employment from 12:00 a.m. on December 31, 1999 onward.[32] The debtors argue that:

> The employees, in fact, manifested their acceptance of the change in their employer by cashing dual paychecks, one from Doctors (the new employer) and one from the Debtors (the former employer), and by otherwise working under Doctors' new management once becoming aware of the change. This "continuing employment constitutes an acceptance which they cannot disclaim at this late date." *Henne v. Allis–Chalmers Corp.*, 660 F.Supp. 1464, 1477 (E.D.Wis. 1987).

Debtors' Post–Trial Memorandum at 24.[33] This argument is unpersuasive.

First, the offer of continued employment in *Henne* preceded the closing of the sale of the assets.[34] In this case, in contrast,

32. Actually, for accounting ease, Doctors paid the employees beginning with the 11:00 p.m. shift on December 30, 1999. This only reinforces the irrelevance of the paychecks Doctors issued: even under the debtors' theory of the case, the debtors' employees were still the debtors' employees despite payment by Doctors for work performed from 11:00 p.m. to 11:58 p.m. on December 30, 1999. Moreover, if employees were paid on the basis of shifts worked, an employee who had no shift on December 31, 1999, would have received no paycheck from Doctors for work performed on December 31, 1999, and so there would be no acceptance of a paycheck from Doctors for December 31, 1999. Such an employee could not be treated as acquiescing in a change of employment effective on December 31, 1999.

33. As already observed in the preceding footnote, this argument would only apply to employees who worked a shift on December 31, 1999.

34. That the employees' employment was terminated was not at issue. Instead, *Henne* involved whether, prior to the sale, the purchasing company had made an offer of employment to the employees. The employees were not entitled to severance pay if their termination by their employer on the sale followed "an offer of employment with another employer who continue[d][the] operation." Prior to the closing of the sale, the employer

there was no offer of new employment communicated until at the earliest 1:00 a.m. on December 31, 1999, sixty minutes too late to undo the employees' having achieved the status of having been employees of the debtors on December 31, 1999.

Second, the employees' acceptance of the paychecks from Doctors for work performed on December 31, 1999, was not conditioned on forfeiting the entitlement to the Pension Plan contribution that had already vested. Without being advised that they would be forfeiting that entitlement, there could not be a waiver of the entitlement. *C.I.T. Corp. v. Carl,* 85 F.2d 809, 811 (D.C.Cir.1936) ("[w]aiver requires

'intentional relinquishment of a known right.' " [citation omitted] ).

Accordingly, for the above-stated reasons, the court finds that the debtors are required to fund the Pension Plan for the year 1999.[35] In light of the court's conclusion that the employees were still employees of the debtors at the commencement of December 31, 1999, the court finds it unnecessary to determine whether, had the employees been terminated on December 30, 1999, the debtors would still be liable for the 1999 Plan contribution, as the Plan Committee alternatively argued, based on a breach of their fiduciary duties or a violation of ERISA § 510.[36]

---

notified the employees on February 26 of the sales agreement and of the purchasing company's plan to retain them. When the sale closed two days later, the employees (apparently with notice of the change in ownership) continued to work at their same jobs. The employees argued that there had never been an offer of employment because the employees were merely transferred and had no choice in the matter. The court held that "despite the informality of [the purchaser's] 'offer' of employment, the plaintiffs' continuing employment constitutes an acceptance which they cannot disclaim at this late date." *Henne,* 660 F.Supp. at 1477. In other words, the court found that the February 26 notification constituted an offer.

**35.** The debtors' Objection alleged at ¶ 5(b) that the proofs of claim were not accurately computed, but the debtors adduced no evidence (beyond that relating to the effective date of termination of the employees' employment) to try to show error in the calculation of the 1999 Pension Plan contribution. The debtors have also not challenged the Plan Committee's assertion that the debtors are jointly and severally liable for the Pension Plan contributions owed by each of them. Nor have the debtors challenged the Plan Committee's assertion that under 26 U.S.C. § 411(d)(3) (1999), all of the employees are entitled to full immediate vesting of all accrued benefits credited to their accounts under the Pension Plan. Finally, as a result of a November 2000 amendment to the Pension Plan, the Plan Committee concedes that no

Pension Plan contribution is owed for the year 2000.

**36.** However, it is obvious that the debtors rushed to treat the sale as completed before midnight on December 30, 1999, in an attempt to avoid the 1999 contribution liability. Instead of prudently awaiting the facsimile transmission from Doctors' lender confirming in writing that it committed itself to wire funds as replacement funds for the check, the debtors (through Shelton) agreed at 11:58 p.m. on December 30, 1999, that the deal was closed, and then awaited receipt of the facsimile minutes later on December 31, 1999. When the facsimile arrived, it differed in material respect from the written commitment that the debtors had previously faxed to the lender, omitting a statement that "all conditions of financing the Purchase have been satisfied." Only on December 31, 1999, could the debtors exercise their fiduciary responsibilities to the estate and determine that the commitment from the lender was in writing and was satisfactory despite the change. (This is the same lender whom the debtors must have viewed with some suspicion because, at an earlier stage of the case, it had withdrawn what the debtors had thought was its commitment to fund a sale to Doctors at a higher price on the very morning that Doctors and the debtors had been prepared to announce that deal to the court.)

The 11:58 p.m. agreement thus appears contrived and artificial, with only one true purpose in mind: time the closing, a few

## C.

### WHETHER THE 1999 PLAN PAY-MENT IS AN ADMINISTRA-TIVE EXPENSE

■ The court now addresses whether the 1999 Plan contribution obligation gives rise to an administrative claim entitled to priority under § 507(a)(1) of the Bankruptcy Code. As noted above, the debtors are participants in a defined contribution plan for the benefit of their employees which requires them to make an annual contribution of 3% of each employee's yearly wages provided that the employee has worked 1000 hours during the plan year and is employed on the last day of the plan year. This Plan held benefits and risks for both the debtors and the employees. From the debtors' standpoint, it would promote employee continuity: an employee had an incentive to remain on the job for at least the full calendar year and perhaps thereafter. However, the debtors took the risk that if they did not terminate an employee prior to December 31 of the year, they would be liable to fund the plan for that employee. The employee also took a substantial gamble: despite having worked 1000 hours, the employee could be dismissed prior to December 31 thereby cutting off any right to the payment. On the other hand, if the employee stayed on the job through December 31, the employee reaped a bonus contribution.

The Plan Committee argues that the 1999 plan obligation should be deemed a priority administrative expense under § 507(a)(1) of the Bankruptcy Code because the obligation to make the 3% contribution accrued during the administrative priority period. In support of its contention, the Plan Committee relies upon *In re Pacific Far East Line, Inc.*, 713 F.2d 476 (9th Cir.1983), and *Columbia Packing Co. v. PBGC*, 81 B.R. 205 (D.Mass.1988). In *Pacific Far East*, a case interpreting § 64(a)(1) of the Bankruptcy Act, the court determined that an employer contribution that became due during the postpetition administrative priority period was entitled to administrative priority despite the fact that the employer contribution was based in part on prepetition work hours. The payments to the plan were due on the twentieth of each month and the payments were due regardless of the employees' eligibility or length of service. The court distinguished the payments due under this plan from the cases evaluating the priority of severance pay claims. Under the severance pay claim analysis, pay at termination in lieu of notice would be compensable as an administrative expense because it is not a form of compensation for past work performed. In contrast, severance pay based upon length of service would not qualify as an administrative expense because this type of severance pay is a form of compensation for work performed before the filing date. *Id.* at 478. The district court determined that the plan contributions could not be analogized to severance pay claims because the payments were due regardless of the employees' eligibility or length of service. As such, the "hours of pre-filing labor were not the consideration for the payments to the plan. Rather the pre-filing hours were merely the units of measure for the post-filing payments, which were necessary for continued performance by both the employee and the employer under the collective bargaining agreement." *Id.* at 479. On appeal, the Ninth Circuit agreed with this analysis, further reasoning that because the indebt-

minutes earlier than it prudently would have been otherwise, to prevent any liability for a

1999 contribution.

edness at issue was not for pre-filing wages, granting an administrative priority to the claims would not frustrate Congress' intent to accord wages a second priority and instead would "serve Congress' intent to authorize administrative expense payments where third persons should be encouraged to deal with the bankrupt estate, since these payments promoted continued performance under a labor agreement." *Id.* at 480.

In *Columbia Packing*, the court considered whether a portion of an employer's contribution that became payable during the priority period but was calculated by reference to services rendered prior to the priority period could be granted administrative priority under § 507(a) of the Bankruptcy Code. The debtor was required to make annual contributions to its plan and these contributions were composed of "normal costs" and "past service liability." The normal costs represented the present value of benefits to be paid in the future and the past service liability was a fixed liability computed by reference to the employees' years of service before creation of the plan. Both parties agreed that the normal cost element had priority under § 507(a)(4) and § 507(a)(1). However, the parties disagreed as to whether the past service liability component was an administrative expense.

The court determined that past service liability was an administrative expense. Although the liability was calculated by reference to services rendered prepetition, the liability had not accrued until after the priority period began. In so finding, the court reasoned that the past service liability is "more properly viewed as an actuarial unit of measure for determining the employer's current periodic contribution than as compensation for work performed before the inception of the plan." *Columbia*

*Packing Co. v. PBGC,* 81 B.R. at 208–09. In other words, the past service liability and the normal cost are the current costs of labor, and as such, constitute an actual and necessary cost of preserving the estate.

The debtors argue that any liability under the Plan with respect to the 1998 and 1999 contributions accrued on December 31 of each year. Notwithstanding, with respect to the 1999 contribution, the debtors argue that administrative priority must be determined by calculating the percentage of the employee's compensation that is related to postpetition service. The debtors do not support their position with any case law directly on point but do rely upon *In re Sunarhauserman, Inc.,* 126 F.3d 811 (6th Cir.1997). In *Sunarhauserman,* the Sixth Circuit determined that a portion of the debtor's minimum funding payments under a defined benefit plan[37] that accrued postpetition was not entitled to administrative priority. The bankruptcy court had determined that the non-normal cost component of the claim of the Pension Benefit Guaranty Corporation was not entitled to administrative expense priority while the normal cost component attributable to the postpetition period would be accorded administrative priority status. The district court and the Sixth Circuit affirmed. The Sixth Circuit agreed that the non-normal cost component of the claim related to debts that arose pre-petition and "it is an absolute requirement for administrative expense priority that the liability at issue arise post-petition.... In this case, the non-normal cost component of Pension Benefit's claim relates to a pre-petition liability." *Id.* at 817.

*Sunarhauserman* does not help the debtors because it is distinguishable from this case. In *Sunarhauserman,* the court

---

37. As previously noted, the debtors have a     defined contribution plan.

considered that portion of a debtor's funding obligation that was an established prepetition liability although it was payable postpetition. In this case, the funding liability did not exist prepetition and actually came into existence postpetition. Thus, under *Sunarhauserman,* the debt at issue in this case does relate to a liability that arose postpetition and therefore qualifies as an administrative expense.

Although none of the cases cited above directly mirror the facts of this case,[38] the more reasoned view is that the 1999 contribution constitutes an administrative expense. The liability of the debtors hinged on one final event: whether the employees were employed as of December 31 of the Plan year. In fact, at any time prior to May 27, 1999, the date of the debtors' bankruptcy filing, an employee could have been terminated from employment and would have had no right to any contribution. Had the plan provided a 3% contribution, regardless of whether the employee was employed on December 31, then the court would feel bound to separate the claim into its prepetition and postpetition components. But in this case, the employee gained no right to payment based upon prepetition work, rather the right to payment came into being only on December 31, 1999. The very fact that an employee could be discharged as late as December 30, something the debtors were hoping to accomplish in this case, demonstrates the speculative nature of the obligation. The debtors took a calculated gamble, and ultimately lost out.

Although an administrative claim does not necessarily have to provide a benefit to the estate, here, the benefit is obvious. The debtors were able to induce employees who might have otherwise left the employ of the hospital to stay on in the hope of receiving the contribution at the end of the year. Dr. Gilbert did not want to "pull the trigger" on the plan because he was aware that it would hurt employee morale, and was aware that it was very difficult both to recruit and retain nurses, and that the hospital only had a value as a going concern. Thus, for a variety of reasons, the debtors only stood to gain by maintaining the current staff.

Accordingly, for the reasons stated above, the 1999 plan contribution is entitled to administrative priority under § 507(a)(1) of the Bankruptcy Code.

## II

## WHETHER THE 1998 PLAN PAYMENT OBLIGATION IS A § 507(a)(1) ADMINISTRATIVE EXPENSE OR A § 507(a)(4) PRIORITY CLAIM

The court now addresses whether the 1998 Plan payment[39] is an administrative expense entitled to priority under § 507(a)(1) or a prepetition contribution claim entitled to priority under § 507(a)(4) of the Bankruptcy Code.

## A.

■ The court first examines whether the 1998 Plan payment, and particularly

---

**38.** For example, in *Pacific Far East,* the court dealt with a plan that required payment into the plan regardless of the employee's eligibility or length of service. In *Columbia Packing,* a component of the plan liability included "past service liability," a liability that existed prepetition and was based upon the prepetition years of service existing before creation of the pension plan.

**39.** The 1998 Plan Payment accrued on December 31, 1998, and payment was due on September 15, 1999. Unlike the 1999 Plan contribution, the parties do not dispute that the debtors are liable for the 1998 Plan contribution.

the part attributable to DCNA members, is an administrative expense under § 507(a)(1) of the Bankruptcy Code. GSCHC argues that because the liability for 1998 contribution accrued on December 31, 1998, the 1998 contribution is at most entitled to priority under § 507(a)(4) of the Bankruptcy Code for that portion of the contribution that relates to services performed 180 days prior to the filing of the bankruptcy petition on May 27, 1999.

As noted above, DCNA entered into a postpetition collective bargaining agreement with GSCHC. DCNA argues that the 1998 Plan payment is entitled to administrative priority because under Article XXXVI of the CBA,[40] GSCHC agreed to maintain all benefits currently in place, including the Pension Plan benefits. DCNA argues that because the 1998 pension contribution was owed at the time it entered into the CBA, it constitutes a benefit that was contemplated to be kept at its current level. Accordingly, argues DCNA, in order to maintain the 1998 Plan benefit at its current level, it must' be granted administrative priority under § 507(a)(1). DCNA points out that its actions subsequent to its entry into the CBA are consistent with its understanding that the 1998 Plan contribution would be accorded administrative priority.[41] In further support

of its position, DCNA directs the court to *In re Adventure Resources, Inc.*, 137 F.3d 786 (4th Cir.1998), and *In re Illinois–California Express, Inc.*, 72 B.R. 987 (D.Colo. 1987).

In *Adventure Resources*, the Fourth Circuit considered the consequences of a debtor's failure, during the pendency of a chapter 11 case, to assume or reject a prepetition collective bargaining agreement. The debtor had breached the collective bargaining agreement both prepetition and postpetition and, during the course of the case, neglected to assume or reject the agreement. The court determined that the collective bargaining agreement was assumed because of the debtor's failure to reject it in accordance with 11 U.S.C. § 1113.

However, the Pension Plan in this case was not a collective bargaining agreement, such that § 1113 has no applicability to the Plan. Moreover, the analysis in *Adventure Resources* ignores § 365(a) of the Bankruptcy Code which provides that "the trustee, *subject to the court's approval,* may assume or reject any executory contract or unexpired lease of the debtor." (Emphasis added.) Assuming that the Pension Plan constitutes an executory contract, it has not been assumed because

---

**40.** Article XXXVI provides:

The benefits currently in place for bargaining unit members (including but not limited to defined contribution pension plan, tax-deferred annuity plan, insurance, holidays, annual leave, sick leave, free days, and supplemental pay) and the policies pertaining thereto will remain at their current levels and in their current form up to and including September 21, 1999 at which time they will be subject to a forty-five (45) day reopener; provided, however, if benefits are increased for non-bargaining unit employees, between the date of this Agreement and September 21, 1999, bargaining unit members' benefits will be similarly increased after negotiations with the Association. If

the parties have been unable to reach agreement within thirty (30) days of the reopener period, they will seek the assistance of a Federal Mediation and Conciliation Service mediator.

Benefits currently in place for bargaining unit members are described beginning Article XXXII.

**41.** DCNA argues that it objected to the sale of the hospital's assets due to the nonpayment of the 1998 Plan liability. In addition, letters were sent to GSCHC regarding the expected funding of the 1998 Plan liability: (1) correspondence dated December 28, 1999, and (2) correspondence dated January 24, 2000.

there was no order approving assumption of the contract in this case. *Data–Link Systems, Inc. v. Whitcomb & Keller Mortgage Co., Inc. (In re Whitcomb & Keller Mortgage Co., Inc.),* 715 F.2d 375, 380 (7th Cir.1983) (assumption of executory contract can occur only through court order).

Even though DCNA's argument is specifically premised on a collective bargaining agreement, and only through that on the Pension Plan itself, *Adventure Resources* is still distinguishable. Because the debtor in *Adventure Resources* was treated by the court of appeals as having assumed the collective bargaining agreement, the debtor was obligated to cure both prepetition and postpetition defaults, which in effect transformed the prepetition pension claims into postpetition claims entitled to administrative priority.[42] In the instant matter, and unlike *Adventure Resources,* the court is not confronted with the effect of the assumption (or nonassumption) of an already existing collective bargaining agreement. Rather, the court deals with a preexisting Pension Plan that GSCHC is still free to move to assume or reject (if it is an executory contract), and a collective bargaining agreement, the CBA between GSCHC and DCNA, that was entered into postpetition. For reasons set forth below, the court rejects DCNA's argument that approval of the CBA effected an assumption of the Pension Plan.

GSCHC unquestionably was obligated postpetition to perform its obligations incurred under the CBA. However, the issue before the court is whether the GSCHC and DCNA, in entering into the postpetition CBA, agreed to treat the 1998 prepetition Plan obligation,[43] an existing prepetition debt, as a postpetition administrative priority expense. *Adventure Resources* does not provide guidance on that question.

Similarly, *Illinois–California Express* fails to address the precise issue before the court. In that case, the court considered the effect of a debtor's renegotiation and assumption of its prepetition collective bargaining agreement. Postpetition, the debtor and the employees entered into a concessions agreement whereby the employees agreed to work at reduced wages. The court determined that "[t]he severance pay to which the employees are entitled under the Concessions Agreement, was consideration and an inducement for the postpetition agreement of the Union employees to supply services to the debtor-in-possession at considerably reduced compensation." *Illinois–California Express,* 72 B.R. at 992. The court reasoned that where the debtor elects to assume a contract and has induced the employees to remain working for the debtor "based on the expectation of administrative priority in the event the debtor's rehabilitation effort failed" it was correct for the court to

**42.** The court specifically stated:
Hence, when Adventure assumed the collective bargaining agreement, it undertook a legal obligation to cure its existing defaults under that agreement, including the arrears to the Pension Trusts. Adventure's failure to comply with its legal obligation gave rise, under *[N.L.R.B. v.] Bildisco [and Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984)] *[In re] Stewart Foods[, Inc.,* 64 F.3d 141 (4th Cir.1995)], to an administrative expense claim on behalf of the Pension Trusts for the entirety of the arrearage. In

effect, Adventure's postpetition assumption of its executory labor contract with the UMWA transformed the prepetition claims of the Pension Trusts, once not cured, into new claims arising postpetition.
*In re Adventure Resources, Inc.,* 137 F.3d at 798.

**43.** The 1998 pension obligation, having accrued before the filing of the debtors' bankruptcy petitions, is a prepetition debt. It does not appear that DCNA contests this point.

find that the "Concessions Agreement serves as the basis for a Chapter 11 claim of administration for any unpaid amount arising under the agreement." *Id.* at 993. Thus, the holding in *Illinois–California Express* was premised upon the debtor's having assumed a prepetition contract and having simultaneously entered into a post-petition modification of that contract in which the employees were induced to work at a reduced rate with the understanding that the claims of the employees would receive priority status. In the instant matter, GSCHC did not assume a prepetition contract which would have the effect of obligating GSCHC to perform all of its obligations under such an agreement, and, as will be discussed below, the provisions of the CBA do not evidence an agreement between GSCHC and DCNA regarding the claim status of the 1998 Plan contribution.

The issue before the court is one of contract interpretation, namely, how to interpret the language contained in Article XXXVI of the CBA which provides that the benefits currently in place for the nurses are to remain at their current levels. By way of explanation, the final paragraph of Article XXXVI states that the "benefits currently in place for bargaining unit members are described beginning Article XXXII." These articles describe the type and amount of benefit for items such as sick leave, vacation pay as well as pension benefits. Article XLVII, which specifically describes the Plan benefit, does nothing more than describe the eligibility and amount of funding to be expected under the Plan. Neither Article XXXVI nor Article XLVII contain any language that would suggest that the 1998 Plan contribution is to be paid as an administrative expense.

Notwithstanding, DCNA argues that the testimony of Herman Brown, who led the negotiating team, should persuade the court that in entering the CBA, the GSCHC agreed to accord priority payment of the 1998 pension benefits. However, Brown's testimony did not provide the court with such evidence. Brown testified that he was hired as an advocate for the nurses to make sure that the nurses kept their benefits at their existing level (or greater) and were in parity with other nurses in the city. With respect to Article XXXVI, Brown stated that the range of benefits that DCNA wanted to maintain included such items as the pension, tax-deferred annuity, annual leave, sick leave and other benefits. Brown did not offer any evidence regarding negotiation of or an agreement reached regarding the treatment of the already existing Plan liability as an administrative expense in GSCHC's bankruptcy case. Brown testified that in drafting the CBA, he referred to the collective bargaining agreements of other area hospitals, which the court views as further evidence of Brown's concern with obtaining a certain level of benefits for the nurses in the future. Brown provided no evidence that DCNA even considered, much less negotiated, how GSCHC would pay past obligations owed to the nurses or what priority the 1998 Plan contribution would receive. Moreover, the CBA does not contain any provisions concerning the priority or payment of the GSCHC's already existing Plan contributions.

In sum, Article XXXVI does not contain any agreement regarding the payment of pension benefits already due and owing. Nor does it evidence any agreement to grant a postpetition administrative claim status to the 1998 Plan contribution. Close examination of Brown's testimony convinces the court that, in negotiating the collective bargaining agreement, Brown was not aware of the impact that GSCHC's bankruptcy might have upon either the

1998 or the 1999 contribution.[44] Thus, the court finds that Article XXXVI's reference to the maintaining "benefits currently in place" refers to the amount, type and level of benefits that the nurses would be entitled to receive under the CBA, making clear that there was to be no decrease in the benefits scheme currently in place for the nurses, and does not address the priority to be accorded CBA claims as against other claims in the bankruptcy case. Because the 1998 Plan liability accrued prepetition, the 1998 contribution is not an administrative expense entitled to priority under § 507(a)(1) of the Bankruptcy Code.

## B.

Section 507(a)(4) of the Bankruptcy Code grants fourth priority, within certain dollar limitations, to allowed unsecured claims for contributions to an employee benefit plan arising from services rendered within 180 days before the date of the filing of the petition.[45] The court addresses first those employees who were employed on December 31, 1998, and concludes that their allowed 1998 contribution claims are entitled to priority under § 507(a)(4) to the extent not exceeding the dollar limitations of that provision.

Although the term "employee benefit plan" is not defined in the Bankruptcy Code, this court has previously determined that it is appropriate to turn to the specific definition of the term as set forth in the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA").[46] *See In re Gerald T. Fenton,* 178 B.R. 582, 586 (Bankr.D.D.C.1995). Given the definition of employee benefit plan found in the ERISA statute, there is no doubt that the claims of the employees for contributions from the Plan constitute claims for "contributions to an employee benefit plan" within the meaning of § 507(a)(4).

Section 507(a)(4) also requires that the claim arise from "services rendered within 180 days before the date of the filing of the petition. . . ." As noted in *Fenton,* many courts have construed § 507(a)(4) broadly "in order to fulfill its purpose of ensuring that employees continue to receive the benefits to which they are entitled despite employer bankruptcy." *Fenton,* 178 B.R. at 584. Thus, in *Fenton,* this court deter-

---

**44.** Significantly, Brown was also unaware of the fact that the Pension Plan could be terminated upon proper notice to the employees. Although he had requested a copy of the Pension Plan from the hospital's management, he never received a copy and nonetheless elected to proceed with the negotiation of the CBA.

**45.** Section 507(a)(4) provides:
Fourth, allowed unsecured claims for contributions to an employee benefit plan—
(A) arising from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only
(B) for each such Plan, to the extent of—
(i) the number of employees covered by each such plan multiplied by $4,300; less
(ii) the aggregate amount paid to such employees under paragraph (3) of this sub-

section, plus the aggregate amount paid by the estate on behalf of such employees to any other employee benefit plan.

**46.** The term "employee benefit plan" contained in the ERISA statute is defined as "an employee welfare Plan or an employee pension benefit Plan or a Plan which is both an employee welfare benefit Plan and an employee pension benefit Plan." 29 U.S.C. § 1002(3). The term "employee pension benefit Plan" is defined to mean "any Plan . . . maintained by an employer . . . to the extent that by its express term or as a result of surrounding circumstances such Plan, fund or program—(1) provides retirement income to employees, or (2) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond. . . ." 29 U.S.C. § 1002(A).

mined that claims for unpaid premiums owed to an insurance company arose from services rendered within 180 days of the bankruptcy filing because the insurance company had rendered services during the 180–day period.

In the instant matter, the 1998 contribution for employees employed on December 31, 1998, arose from services rendered within 180 days of the filing of the petition[47] because December 31, 1998, is the date that the pension obligation actually arose based on employment on that date, a date that fell well within 180 days prior to the filing of the bankruptcy petition.

The debtors concede that the 1998 contribution for such employees is accorded priority under § 507(a)(4), however, the debtors argue that the priority of the claim should be limited to "that portion of the contribution that relates to services performed during the 180–day period." (Supplemental Brief, p. 46.) However, the liability for the Plan contribution is not calculated on a per diem basis and does not fluctuate based upon the number of hours worked by a given employee. Rather, the liability under the Plan is an all or nothing proposition, predicated on the employees' being employed on December 31 after having worked 1,000 hours in a given Plan year. As in the case of the administrative claim for the 1999 Plan contribution, the critical event is employment on December 31 of the Pension Plan year: without such year-end employment, an employee's prior hours of service gain the employee no right to a Plan contribution.

The requirement of 1,000 hours of prior service limited the pool of employees entitled to obtain a Plan contribution, but entitlement to receive a contribution carried a price: those eligible employees had to provide the service to the debtors of remaining employed on December 31, 1998, if they were to receive the Plan contribution. An eligible employee who chose not to remain employed on December 31, 1998, would receive no Plan contribution despite having worked more than 1,000 hours in the Plan year. So the service being compensated is continued employment on December 31, 1998.

As already observed with respect to the 1999 Plan contribution, compensating employees for the loyalty of remaining employed on December 31 of a Plan year had obvious benefits to the debtors. The debtors could avoid the contribution liability by simply terminating an employee's employment on or before December 30 of the Plan year, so that the compensation would not arise from the prior 1,000 hours of service. Obviously terminating their employees' employment, and destroying the hospital's value as a going concern, was not to the debtors' advantage, and they received a benefit (for which the contribution liability was the price to the debtors) when they continued employment of the employees on December 31, 1998.

By continuing to employ the services of eligible employees on December 31, 1998, the debtors incurred liability to the employees on that date for the 1998 Plan year contribution. Accordingly, the contribution must be treated as arising from employment on December 31, 1998, and hence as "arising from services rendered within 180 days before the date of the filing of the petition" within the meaning of § 507(a)(4)(A). The 1998 contribution for such employees will be accorded priority under § 507(a)(4) to the extent within the dollar limitations of that provision.[48]

---

**47.** The 180–day period prior to the filing of the bankruptcy petition on May 27, 1999 commenced on November 28, 1998.

## C.

■ Determining the extent to which the 1998 Plan contribution claims are entitled to priority under § 507(a)(4) requires the court also to address the extent to which employees became entitled to the contribution even though they were not employed on December 31, 1998. Entitlement for some employees to a Plan contribution for 1998 may have arisen from retirement, death, or the incurring of a disability prior to December 31, 1998. Not all such employees' claims for the 1998 Plan contribution will be entitled to § 507(a)(4) priority.

Employees who became entitled to a 1998 Plan contribution because they retired, died, or incurred a disability prior to November 28, 1998, the 180th day preceding the filing of the debtors' bankruptcy petitions on May 27, 1999, are not entitled to have that contribution treated as a claim entitled to priority under § 507(a)(4). In contrast, employees who became entitled to a 1998 Plan contribution because they retired, died, or incurred a disability on or after November 28, 1998, are entitled to have their claims treated as claims entitled to priority under § 507(a)(4) (to the extent within that provision's dollar limitations). As in the case of employees who became entitled to a Plan contribution based on

employment on December 31, 1998, it is not appropriate to attempt to allocate part of the Plan contribution claim for such employees to work performed before the 180–day mark of November 28, 1998.

The debtors adduced no evidence regarding this issue (of entitlement arising from death, retirement, or incurring of disability prior to November 28, 1998). The proof of claim is presumptively valid. But if the parties had an agreement to defer this issue, then for employees who were no longer employed by the debtors on December 31, 1998, the parties will be permitted to submit a calculation of the portion of the 1998 Plan contribution liability that is entitled to priority under § 507(a)(4) and the part that is not entitled to such priority.

### III

### THE PLAN COMMITTEE'S CLAIM FOR COSTS AND EXPENSES

■ The Committee contends that it has an allowable claim for postpetition expenses incurred in connection with the administration of the Plan. The debtors, relying on provisions contained in a May 1, 2000 amendment to the Plan, contend that any payment or reimbursement of expenses is to be made from the Fund[49] unless there is an election by the Employer[50]

---

48. The parties will be permitted to submit a proposed calculation of the amount of the claim entitled to § 507(a)(4) priority. The debtor urged in its Supplemental Memorandum (DE No. 1818) at 48 that the Plan Committee's 1998 contribution calculation is erroneously based on the amount of the 1997 payment on the annual report, which included a higher employer contribution, and incorrectly includes amounts due the Internal Revenue Service, not the Pension Plan or participants. However, the debtors adduced no evidence to show error in the calculation of the contribution liability for 1998. As in the case of the liability for 1999, the debtors

have not contested the Plan Committee's assertions regarding joint and several liability, and vesting.

49. Section 1.23 of the Plan defines the term "Fund" to mean "[a]ll assets of whatsoever kind or nature in any Contract or other insurance contract used to fund the Plan or held from time to time by the Trustee under the Trust."

50. Section 1.19 of the Plan defines the term "Employer" as "[t]he Company and any entity that is or hereafter becomes a Member Company." Section 1.10 of the Plan defines

to pay such expenses.[51]

Prior to the May 1, 2000 amendment to the Plan, § 9.3 of the Plan provided that the "Employer shall pay, or reimburse the member of the Committee for, all reasonable expenses incurred." In addition, under § 15.5 of the Plan,[52] each member company was liable for its "fair share" of the expenses and the Committee had the sole discretion to determine the amount of the expenses. Effective May 1, 2000, the language § 9.3 of the Plan was deleted in its entirety. Section 9.3, as amended, provides that the Committee shall be entitled to reimbursement of all out-of-pocket expenses and the reimbursement of expenses shall be made from the Fund unless the Employer elects to reimburse or pay such expenses on behalf of the fund.[53] In addition, the language contained in § 15.5 was deleted in its entirety. That section, as amended, provides that "[i]n the event that the Employer elects to pay or reimburse the Fund for the expenses incurred on behalf of the Plan pursuant to the terms of Section 9.3 ... each member Company shall be liable for and pay its fair share of expenses...." Finally, the language contained in § 9.6 of the Plan was deleted in its entirety. As amended, that section specifically provides that the Committee "may employ and enter into agreements with such counsel, accountants, brokers, investment advisors, and other agents, and pay their reasonable expenses and compensation out of assets of the Fund (unless reimbursed or paid by the Company pursuant to Section 9.3)." In addition, § 9.6 further provides that "[a]ny expenses incurred by the Committee in connection with the exercise of its powers shall be deemed an administrative expense of the Plan, payable out of the Fund unless paid or reimburse by the Employer pursuant to Section 9.3." Prior to its amendment, § 9.6 granted broad power to the Committee regarding the administration of the Plan and did not speak to any limitations on the Committee with respect to the re-

---

"Company" as the "Greater Southeast Management Company, a not-for-profit corporation established under the laws of the District of Columbia and exempt from Federal income tax as an organization described in Code Section 501(c)(3), and any successor by merger, consolidation, purchase or otherwise."

51. Section 11.1 of the Plan provides that any or all of the provisions of the Plan may be amended. Although the Committee has not conceded that the debtors had the authority to amend the Plan, it has not provided any basis upon which to challenge the amendments to the Plan.

52. Former § 15.5 of the Plan provided in part:

Each member company shall be liable for and pay at least annually to the Company its fair share of the expenses of operating the Plan, the Contracts and the Trust, including its share of any Insurance Company or Trustee's fees. The amount of such charges to each Member Company shall be determined by the Committee in its sole discretion....

53. In its entirety, amended § 9.3 provides:

*Reimbursement of Expenses of Committee.* The Committee shall be entitled to reimbursement for all reasonable out-of-pocket expenses incurred in the performance of its duties hereunder. Any member of the Committee who is employed by the Company or an Associated Company, or who serves as a director of the Company or an Associated Company shall serve without compensation for his services hereunder, but he shall be reimbursed for any reasonable out-of-pocket expense incurred by him in connection with his service on the Committee. The payment shall be made from the Fund unless the Employer elects to reimburse or pay such expenses on behalf of the Fund. None of the general overhead expenses of the Company (or any Associate Company) shall be included in the term 'out-of-pocket' expenses. In the event an Employer is a debtor under the Title 11 of the United States Code, an election to pay or reimburse expenses on behalf of the Fund may require approval of the United States Bankruptcy Court.

imbursement of its administrative expenses.

It is evident that the effect of the above amendments was to ensure that all expenses in connection with the administration of the Plan be paid from the Fund absent an election to the contrary. However, the debtors concede that the amendments to the Plan are prospective only. Prior to the May 2000 amendments, § 9.3 clearly required the Employer to pay or reimburse the members of the Committee for *all reasonable expenses incurred.* In turn, former § 15.5 provides that each Member Company is liable for its fair share of the operation expenses with the amount of such expenses to be determined in the Committee's sole discretion. Thus, from May 27, 1999 through May 1, 2000, the Employer (Greater Southeast Management Company) was required to reimburse the Committee for any expenses incurred in the administration of the fund in an amount determined by the Committee. The court finds the postpetition expenses from May 27, 1999 through May 1, 2000, arising from the administration of the Plan, are administrative expenses of the estate within the meaning of § 503(b)(1) of the Bankruptcy Code and therefore are accorded priority under § 507(a)(1). Whether such expenses shall be allowed by the court is subject to further review of the court upon submission by the Committee of a detailed itemization of such expenses.

With respect to those expenses incurred in the administration of the Plan after May 1, 2000, the Plan provides that expenses are to be paid from Fund unless the Employer elects to pay the expenses. Thus, those expenses incurred after May 1, 2000 shall not be deemed administrative expenses of the estate unless an election by the Employer is made to pay or reimburse such expenses in lieu of the expenses being paid by the Fund.

## IV

## CONCLUSION

Given the foregoing, the Debtors' Objection to the Claim of the Plan Committee will be sustained in part and denied in part. The Plan Committee is entitled to an administrative claim for the 1999 Pension Plan contribution and for those expenses incurred in the administration of the Plan from May 27, 1999 through May 1, 2000. In addition, the 1998 Plan contribution will be accorded priority pursuant to § 507(a)(4) to the extent of its dollar limitations. The balance of the 1998 claim that is not entitled to priority will be treated as a general unsecured claim of the estate. In light of the decision of the court, the parties will be required to submit specific computations of the above claims.